# **EXHIBIT "C"**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X
ERIC MEINDL and ANTHONY NEGRON, on behalf of
themselves and all others similarly situated,

                        Plaintiffs,

       - against -

MOBILTY CENTER, INC. d/b/a I FIX SCREENS,
IZZMATIC INNOVATIONS LLC d/b/a I FIX SCREENS,
I FIX SCREENS ASTORIA BLVD, LLC, I FIX SCREENS
GREAT NECK, LLC, I FIX SCREENS NYC, LLC, I FIX
SCREENS FLORIDA, INC., KAMRAN FAISAL AND
ABED ZIADA.

                        Defendants.
------------------------------------------------------------------------- X

Case No. 2:16-cv-05894-JMA-GRB

## DECLARATION OF ERIC MEINDL

      I, Eric Meindl, declare, upon personal knowledge and under penalty of perjury, pursuant to 28 U.S.C. Section 1746, that the following is true and correct:

      1.    I am a resident of the State of New York. I am a Plaintiff and Class Representative in this action and I submit this declaration in support of the Plaintiffs' motion to the Court for an order permitting court supervised notification to potential class members.

      2.    I make this request to the Court because I am one of approximately 90 current and former cell phone repair technicians who were or currently are employed by Defendants in the States of New York and Florida, and who I believe were not properly compensated for all the hours they worked.

      3.    Defendants were and still are in the business of repairing cellular phones in the States of New York and Florida.

      4.    From in or about January 2016 to in or about March of 2016 I was employed by Defendants as a cell phone repair technician.

5.  I am requesting that notice be circulated to other of Defendants' former and current cell phone repair technicians so that they may be advised of their ability to recover overtime wages that they are owed.

**Duties**

6.  As a cell phone repair technician for Defendants, my primary job duties included, but were not limited to:

    a.  Repairing cellular phones and tablets;

    b.  Selling products such as cellular phone accessories; and

    c.  Taking inventory of the products sold at Defendants' stores and kiosks.

7.  Other cell phone repair technicians performed the same or very similar tasks.

**Hours and Compensation**

8.  When I was first hired, I was told to report to 42 Jericho Turnpike, Commack, NY 11725, the "Commack" location of I Fix Screens for training. I "trained" at the Commack store for about a week.

9.  Thereafter, I was employed at 160 Walt Whitman Road, Huntington Station. NY 11746, the "Walt Whitman" location of I Fix Screens.

10. I did not have a typical schedule; however, I was assigned to either the morning or afternoon shift. The typical morning shift was from 9am to 4pm. The typical afternoon shift was from 3pm to 9pm.

11. I was paid an hourly wage of $9.00 per hour. I also received a small bonus for meeting certain goals. These goals included obtaining a certain number of "likes" on social media or having a customer write a "yelp" review.

2

12. However, during the course of my employment, there were times where I was paid below the minimum wage.

13. Specifically, I was not paid the minimum wage during training. Training involved working a full shift at an "I Fix Screens" kiosk or store without being paid the minimum wage.

14. I spent an entire week "training" at the Commack location of I Fix Screens, during that week I worked around 32 hours.

15. I complained to a manager named "Izzy" about not being paid for training, and he informed me that it was company policy not to pay employees for training.

16. Because of my complaints, he issued me a check from "Izzmatic Innnovations, LLC" for $100 dollars to allegedly cover food and transportation for the week. I had worked around 32 hours that week, and was only paid this $100 check. (Exhibit A; Izzmatic Check).

17. The address on this check was 42 Jericho Turnpike, Commack, New York 11725, the "Commack" location of I Fix Screens.

18. There were also times where it seemed like I was being paid below the minimum wage. Several times I divided the amount on my check by the number of hours I worked, and my hourly rate seemed to be below the minimum wage.

19. During the course of my employment, there were also weeks where I worked more than 40 hours in a workweek for which Defendants did not pay me overtime.

20. One occasion when I worked overtime was when Anthony Negron went on vacation for about two weeks. I worked over 40 hours a week for both of those weeks.

21. Defendants never compensated me for all of the hours I worked in over 40 per week.

3

22.     I was paid by check from "Mobility Center, Inc." the address on the check was 3205 Middle Country Road, Lake Grove, New York 11755, the "Lake Grove" location of I Fix Screens.

23.     I only received a paystub one time during my employment. The paystub did not list my hourly rate. It only listed the total pay and the withholdings.

**Unpaid Mandatory Meetings**

24.     Defendants regularly held weekly mandatory meetings. These meetings occurred at either at 203 Centereach Mall, Centereach, New York 11720, the "Centereach" location of I Fix Screens.

25.     Employees from the Centereach, Walt Whitman, Lake Grove, and Smithaven (located at 313 Smith Haven Mall, Lake Grove, NY 11755) stores attended these meetings, as well as some other employees I did not know.

26.     The topics that were discussed at the mandatory meeting all related to our job as cell phone repair technicians. Topics included: Sales quotas, taking inventory, getting facebook "likes" and yelp reviews, discounts that are being offered to customers, upselling the inventory, sales techniques and customer greetings.

27.     The other employees and myself were not compensated for time spend attending the mandatory meetings.

28.     At one mandatory meeting, I clocked-in using the app when I walked into the meetings. Defendant Karman Faisal checked his phone and then said to me "Hey Eric, you are clocked-in" then I checked the phone a few minutes later and I saw that I was no longer clocked-in. It was apparent to me that I had been clocked-out.

4

**Defendants were Aware of my Unpaid Work**

29. Defendants were aware of the hours that I and other cellular phone technicians worked.

30. The first month or two that I worked at "I Fix Screens" I was required to clock-in and clock-out of work using the computer system located at the store.

31. After the first month or two, I Fix Screens required us to download to applications to manage our time, "When I Work Employee Scheduling" and "When I Work Time Clock & Attendance."

32. I was given a username and password for these two applications. After I left the company, my access was removed from these two applications.

33. The district manager "Tito" or one of the store managers would create the schedule for the Walt Whitman store using application "When I Work When I Work Employee Scheduling." The schedule was created or updated every Sunday. We would either receive the schedule through the application, via text, or via e-mail.

34. Defendants were aware of the hours I worked because myself and the other cell phone repair technicians were required to clock-in and clock-out using the application "When I Work Time and Attendance."

35. The application would only allow us to clock-in and clock-out if our cellular phone was in the required radius of the store. The application would determine if we were in the radius of the store using the GPS tracking on our cellular phones.

36. The supervisors had the ability to clock employees in our or out using the mobile application. The supervisors also had the ability to view who was currently clocked-in and how many hours an employee had worked from the application.

**Other Cell Phone Repair Technicians**

37. I believe that other cell phone repair technicians routinely worked more than 40 hours a week, and were not paid time and half for all hours they worked over 40 a week.

38. Defendants employed a large number of cell phone repair technicians throughout the States of New York and Florida. I was aware of Defendants' other locations because I would see employees from the Centereach, Smithaven, Walt Whitman, and Lake Grove locations at the mandatory meetings. I also trained at the Commack location with other cell phone repair technicians.

39. I also knew there were other locations because the employees were sent group texts by Defendant Kamran Faisal, the owner from I Fix Screens, there were employees from the Centereach, Smithaven, Walt Whitman and other locations that I did not know on this group text. I knew this because of what was discussed in the group text.

40. I knew that I Fix Screens had Florida locations because "Tito" mentioned the Florida stores to me. He told me that I might not meet Defendant Abed Ziada until later because he was opening the Florida store. I knew that Defendant Ziada was a co-owner of the I Fix Screens because he was talked about in meetings. Also the staff discussed that he was an owner.

41. I worked at the Walt Whitman store. I worked with at least six other employees at the Walt Whitman Store, including but not limited to, Xavier (last name unknown), Anthony Negron, Jawad (last name unknown), Galal (last name unknown), Mohammed last name unknown), and other former cell phone repair technicians whose names I currently do not remember, who had the same or similar primary job duties as me.

42. I know that throughout my employment with Defendants, almost all of their cell phone repair technicians worked in excess of 40 hours a week and did not receive overtime pay

6

for all the hours they worked over 40 per week, because I saw them working more than 40 hours a week, we had an application which showed that they worked over 40 hours a week, and they told me they worked in excess of 40 hours per week without overtime pay.

43. I saw Anthony, Xavier, and other employees working over 40 hours a week routinely.

44. I also know that many of the other employees were sometimes paid below the minimum wage because they discussed their hourly rate and deductions from their paycheck with me.

45. I discussed with Galal and Xavier that it often seemed on my checks as if I was getting paid below the minimum wage.

46. I also saw Xavier, Jawad, and Anthony complaining about their pay. I remember that Anthony talked to Tito about the deductions and told him that they were unfair.

**Termination**

47. On or about March 16, 2016, I complained to a manager named Khaled (last name unknown) that Defendants' practice of deducting money from employees' wages for disciplinary violations was illegal.

48. Immediately after this complaint "Tito" told me I was terminated and they would not be paying my last check.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  Melville, New York
        2/14/2017
        _____

                                                 *E. Meindl*
                                           D48235757D4E4E7
                                             ERIC MEINDL