# **EXHIBIT "D"**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X
ERIC MEINDL and ANTHONY NEGRON, on behalf of
themselves and all others similarly situated,

                    Plaintiffs,

    - against -

MOBILTY CENTER, INC. d/b/a I FIX SCREENS,
IZZMATIC INNOVATIONS LLC d/b/a I FIX SCREENS,
I FIX SCREENS ASTORIA BLVD, LLC, I FIX SCREENS
GREAT NECK, LLC, I FIX SCREENS NYC, LLC, I FIX
SCREENS FLORIDA, INC., KAMRAN FAISAL AND
ABED ZIADA.

                    Defendants.
------------------------------------------------------------------------- X

Case No. 2:16-cv-05894-JMA-GRB

## DECLARATION OF ANTHONY NEGRON

I, Anthony Negron, declare, upon personal knowledge and under penalty of perjury, pursuant to 28 U.S.C. Section 1746, that the following is true and correct:

1. I am a resident of the State of New York. I am a Plaintiff and Class Representative in this action and I submit this declaration in support of the Plaintiffs' motion to the Court for an order permitting court supervised notification to potential class members.

2. I make this request to the Court because I am one of approximately 90 current and former cell phone repair technicians who were or currently are employed by Defendants the States of New York and Florida, and who I believe were not properly compensated for all the hours they worked.

3. Defendants were and still are in the business of repairing cellular phones in the States of New York and Florida

4. From in or about June of 2015 to in or about May of 2016 I was employed by Defendants as a cell phone repair technician.

5. I am requesting that notice be circulated to other of Defendants' former and current cell phone repair technicians so that they may be advised of their ability to recover overtime wages that they are owed.

**Duties**

6. As a cell phone repair technician for Defendants, my primary job duties included, but were not limited to:

    a. Repairing cellular phones and tablets;

    b. Selling products such as cellular phone accessories; and

    c. Taking inventory of the products sold at Defendants' stores and kiosks.

7. Other cell phone repair technicians perform the same or very similar tasks.

**Hours and Compensation**

8. I was employed at 160 Walt Whitman Road, Huntington Station. NY 11746, the "Walt Whitman" location of "I Fix Screens."

9. I typically worked six days a week, everyday except for Tuesday. I typically worked between 35 and 45 hours a week.

10. There were many weeks where I worked more than 40 hours in a workweek for which Defendants did not pay me overtime.

11. Defendants occasionally paid me for some of the hours I work in excess of 40 per week. However, Defendants never compensated me for all of the hours I work in excess of 40 per week.

12. I was paid an hourly wage of $9.00 or $10.00 per hour. I also received a small bonus for meeting certain goals. These goals included obtaining a certain number of "likes" on social media or having a customer write a "yelp" review.

13. However, there were also some weeks in which I worked, and I was being paid below the minimum wage.

14. Specifically, from February 5, 2016 to February 18, 2016, my timesheets show that I worked 94.16 hours. However, I only received a check for the $733.19. (Exhibit B; Negron Timesheet and Check).

15. I was also paid by check which had the name of "Mobility Center, Inc." on it and listed the address as 3205 Middle Country Road, Lake Grove, NY 11755, the "Lake Grove" location of I Fix Screens.

**Unpaid Mandatory Meetings**

16. Additionally, Defendants regularly held weekly mandatory meetings. These meetings occurred at either at 203 Centereach Mall, Centereach, New York 11720, the "Centereach" location of I Fix Screens or the Lake Grove location of I Fix Screens.

17. Employees from the Centereach, Walt Whitman, Lake Grove, and Smithaven (located at 313 Smith Haven Mall, Lake Grove, NY 11755) stores attended these meetings.

18. The topics that were discussed at the mandatory meeting all related to our job as cell phone repair technicians. Topics included: how to properly fill out disclaimer sheets, sales techniques, discounts being offered to customers, disciplinary deductions from wages, and trainings on our time keeping system.

19. The other employees and myself were not compensated for time spend attending the mandatory meetings.

20. I know that we were not compensated for attending these meetings because a friend of mine, Eric Meindl, clocked-in for one mandatory meeting and the owner of the company, Defendant Karman Faisal, told us all at the meeting that it was a mistake for Eric

Meindl to clock in. Mr. Faisal then proceeded to clock Mr. Meindl out of our time-keeping application.

**Defendants were Aware of my Unpaid Work**

21. Defendants were aware of the hours that I and other cell phone technicians worked.

22. The first month or two that I worked at I Fix Screens I was required to clock-in and clock-out of work using the computer system located at the store.

23. After the first month or two, I Fix Screens required us to download to applications to manage our time, "When I Work Employee Scheduling" and "When I Work Time Clock & Attendance."

24. I was given a username and password for these two applications. After I left the company, my access was removed from these two applications.

25. The district manager "Tito" or one of the store managers would create the schedule for the Walt Whitman store using application "When I Work When I Work Employee Scheduling." The schedule was created or updated every Sunday. We would either receive the schedule through the application, via text, or via e-mail.

26. Defendants were aware of the hours I worked because myself and the other cell phone repair technicians were required to clock-in and clock-out using the application "When I Work Time and Attendance."

27. The application would only allow us to clock-in and clock-out if our cellular phone was in the required radius of the store. The application would determine if we were in the radius of the store using the GPS tracking on our cellular phones.

28.     The supervisors had the ability to clock employees in our or out using the mobile application. The supervisors also had the ability to view who was currently clocked-in and how many hours an employee had worked from the application.

29.     Both Defendant Karman Faisal and Abed Ziada were aware of how many hours myself and the other cell phone repair technicians were working because they would visit the Walt Whitman store. Defendant Faisal would visit the store weekly. Defendant Ziada would visit the store very frequently and inspect the store.  He often threatened to deduct my wages and the wages of my coworkers based on what he observed in the store.

**Other Cell Phone Repair Technicians**

30.     I believe that other cell phone repair technicians routinely worked more than 40 hours a week, and were not paid time and half for all hours they worked over 40 a week.

31.     Defendants employed a large number of cell phone repair technicians throughout the States of New York and Florida. I was aware of Defendants' other locations because I would see employees from the Centereach, Smithaven, Walt Whitman, and Lake Grove locations at the mandatory meetings. Defendant Ziada and my co-workers also mentioned that Mr. Ziada was often in Florida working on the I Fix Screens Florida locations.

32.     I worked at the Walt Whitman location. At Walt Whitman location I worked with four other employees, including but not limited to, Mohammed (last name unknown), Xavier Molina, Eric Meindl, "Galal," and other former cell phone repair technicians whose names I currently do not remember, who had the same or similar primary job duties as me.

33.     I know that throughout my employment with Defendants, almost all of their cell phone repair technicians worked in excess of 40 hours a week and did not receive overtime pay for all the hours they worked over 40 per week, because I saw them working more than 40 hours

a week, we had an application which showed that they worked over 40 hours a week, and they told me they worked in excess of 40 hours per week without overtime pay.

34. I also know that many of the other employees were sometimes paid below the minimum wage because they discussed their hourly rate and deductions from their paycheck with me.

35. Mohammed was fired sometime in 2016, for complaining about unlawful deductions such as failing to lock the money drawer.

36. A man who worked for the company before me, Fawad was deducted 25 dollars for everyday he was late. I know this because I was friends with him, and one day he walked by the Walt Whitman location and told me that his wages were often deducted for being late.

37. I also know that Eric Meindl spoke to the manager and told him it was illegal for them to deduct his wages for disciplinary reasons.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Melville, New York
2/15/2017

DocuSigned by:
*[signature]*
1BB4B06952AE477
ANTHONY NEGRON